UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAKES PILOTS ASSOCIATION, INC.

              Plaintiff,

                                                    No. 2:11-cv-15462
vs.                                                 Hon. Gerald E. Rosen

UNITED STATES COAST GUARD

              Defendant.

_____/

## OPINION AND ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REMANDING THE MATTER TO <u>DEFENDANT</u>

## I. INTRODUCTION

This Administrative Procedures Act (APA) matter requires navigating a combination of the Great Lakes Pilotage Act, agreements between the United States and Canada, and an administrative record to determine whether the United States Coast Guard violated the APA when it ordered the Lakes Pilots Association, Inc. (LPA) to repay close to $200,000.00 to the shipping industry for its alleged overbilling practices.  Before this Court are the parties' cross-motions for summary judgment.  Having reviewed the parties' briefs in support of and in opposition to the respective motions, the accompanying exhibits, and the administrative record, the Court finds that the relevant facts, allegations, and legal arguments are

adequately presented in these written materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. For the reasons stated below, the Court denies the parties' cross-motions for summary judgment and remands the matter to Defendant for additional proceedings consistent with this Opinion and Order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The Great Lakes Pilotage Act

In 1960, one year after the Saint Lawrence Seaway opened the Great Lakes to international shipping, Congress enacted the Great Lakes Pilotage Act (GLPA or Act) in order to regulate the manner in which commercial ships are piloted while navigating through the Great Lakes, their connecting and tributary waters, the Saint Lawrence River and adjacent port areas. *See* 46 U.S.C. § 9301 *et seq.* As relevant here, the GLPA requires that "each vessel of the United States operating on register and each foreign vessel . . . engage a United States or Canadian registered pilot" to either "direct the navigation of the vessel" or "be on board and available to direct the navigation of the vessel." § 9302(a)(1). The GLPA authorizes the

Secretary of Transportation (Secretary)[1] to promulgate regulations governing these pilotage services, including licensing and registration standards, permissible rates and charges, and general conditions of service.  § 9303.

In order "to provide the efficient dispatching of vessels and rendering of pilotage services," the GLPA authorizes "the formation of a pool by a voluntary association of United States registered pilots."  § 9304(a).  The President of the United States has designated three geographic areas for these pools to operate, known as District One, District Two, and District Three.  46 C.F.R. § 401.300(a).  The Coast Guard has certified the Lakes Pilots Association as the certified pilot association for District Two -- Lake Erie, the Detroit River, Lake St. Clair, and the St. Clair River to the mouth of Lake Huron.  § 401.300(a)(2); A.R. 000367.

The GLPA also permits the Secretary to enter into agreements with Canada in order "[t]o provide for a coordinated system of pilotage service on the Great Lakes."  46 U.S.C. § 9305.  Beginning a year after the passage of the GLPA, the United States and Canada have entered into several such agreements.  (A.R. 002851-2907).  These Memorandums of Arrangements (MOAs) essentially divide up pilotage services between U.S. and Canadian Pilots across the Great Lakes. The division of pilotage services at issue here are those relating to the Welland

---

[1] Pursuant to 46 U.S.C. § 2104(a), the Secretary delegated this authority to the Coast Guard.

3

Canal (Canal).  The Canal, located entirely within Canada, connects Lake Ontario (at Port Weller, Ontario) with Lake Erie (at Port Colborne, Ontario).

Initially, the United States and Canada equally shared piloting responsibility for the Canal.  (A.R. 002876).  This changed sometime in the 1970s, when Canadian pilots took over exclusive responsibility for piloting through the Canal. The current MOA, which is retroactive to January 18, 1977, added two provisions to effectuate this change.  First, the MOA designated the Canal as "Canadian pilots only."  (*Id.* at 002902).  Second, it expanded the definition of the Canal to include all waters extending in a one-mile arc from the Canal's northern (Port Weller) and southern (Port Colborne) approaches.  (*See, e.g., id.* at 002898) ("In the southern approach, within an arc drawn one mile to the southward of the outer light on the western breakwater at Port Colborne.").  Accordingly, the MOA provides that only Canadian pilots are to navigate both through the Canal and in its northern and southern approaches.

### 2.    Applicable Coast Guard Regulations and LPA's Actions Under These Regulations

Coast Guard regulations set the exact rates, charges and fees pilots may charge for their services, and provide a dispute resolution process for disputed fees. *See, e.g.,* 46 C.F.R. §§ 401.400-50.  Pilots are prohibited from charging a "vessel, owner, or master thereof," any rate or charge that "differs from the rates and charges" set forth in the regulations "without the approval of the Director [of the

Coast Guard's Great Lakes Pilotage Office (Director).]"  § 401.430.  This fee-dispute matter involves two separate regulations for the 2006 and 2007 shipping seasons: (1) the regulation governing "change points;" and (2) the regulation permitting pilots to assess an additional charge when a vessel's passage is interrupted, delayed, or canceled.

### a.      46 C.F.R. § 401.428 -- Mandatory "Change Points"

Coast Guard regulations mandate compulsory periods of rest and require pilots to switch at certain "change points."  §§ 401.450; 401.451.  These are anchored in safety-concerns: "Compulsory periods of rest between assignments and the prohibition of marathon assignments will enhance safety by insuring the availability of a well-rested and more effective pilot."  33 Fed. Reg. 4747 (Mar. 20, 1968).  Moreover, the regulations require vessels to pay U.S. pilots certain rates -- commonly referred to as "overcarriage" fees -- plus any "reasonable travel expenses to or from the pilot's base" if "a U.S. pilot is carried beyond the normal change point or is unable to board at the normal boarding point. . . . The change points to which this section applies are designated in § 401.450."  46 C.F.R. § 401.428.  In promulgating this regulation, the Coast Guard noted that although "[i]t is unusual for a U.S. pilot to be carried beyond his change point . . . extreme weather conditions can result in this occurrence, and the U.S. pilot then loses

working time plus the cost of transportation to or from his home base."  39 Fed.
Reg. 31529 (Aug. 29, 1974).

Since 1968, the regulations mandate that vessels change pilots at 10 specific
change points across the Great Lakes: (a) Snell Lock; (b) Cape Vincent; (c) Port
Weller; (d) Lock No. 7, Welland Canal;[2] (e) Detroit/Windsor, other than
assignments originating or terminating at a point on the Detroit River; (f) Port
Huron/Sarnia; (g) Detour; (h) Gros Cap; (i) Chicago with respect to assignments
originating at Detour or Port Huron/Sarnia; and (j) Duluth/Superior and Fort
William/Port Arthur with respect to assignments originating at Gros Cap.  46
C.F.R. § 401.50 (1968).  An example of an in-bound vessel traveling from Cape
Vincent -- the western mouth of the St. Lawrence Seaway on Lake Ontario -- to
Detroit illustrates the effect of the GLPA and the Coast Guard's change point
regulation as written: (1) the vessel travels from Cape Vincent across Lake
Ontario; (2) at Port Weller, the vessel changes pilots and a Canadian pilots the
vessel south through the Canal; and (3) at Lock No. 7, inside the middle of the
Canal, the vessel again change pilots, who then pilots the vessel to Detroit.

The problem with this scheme, however, is that it does not account for the
MOA in effect since 1977 making the Canal the exclusive territory for Canadian

---

[2] After the events at issue in this lawsuit, the Coast Guard amended this regulation
by changing the "Lock No. 7, Welland Canal" reference to "Port Colborne."  46
U.S.C. § 401.450 (effective September 29, 2008).

pilots; while 46 C.F.R. § 401.450 mandates a change *inside* the Canal at Lock 7, the MOA prohibits U.S. pilots from piloting ships inside the Canal -- including the one-mile approach extending from Port Colborne into Lake Erie (commonly referred to as the "arc").[3]   In the 2006 and 2007 shipping seasons, LPA charged overcarriage fees where its pilots did not change at the arc and rather changed in the Canal at Port Colborne (the Change Point).   As set forth in more detail below, the Coast Guard contends that these § 401.428 overcarriage charges are improper and ordered LPA to reimburse the shipping industry nearly $115,000.

### b.   46 C.F.R. § 401.420 -- Charges for Cancelation, delay or interruption in rendition of services

Separately, vessels may incur additional pilotage charges when, "for the convenience of the ship," a pilot is retained during a period of interruption, if a pilot is detained on board a vessel after the end of a pilot's assignment, or if a vessel's departure of movage is delayed.  § 401.420(a-b).  Additionally, if a pilot reports to a vessel as ordered and is subsequently canceled, the vessel must pay cancelation charges and "for reasonable travel expenses if the cancelation occurs after the pilot has commenced travel [to the change point.]"  § 401.420(c)(1-3).  As

---

[3] Other provisions of the regulations create further tension for associations under the Coast Guard's oversight as the regulations require voluntary associations to "coordinate on a reciprocal basis its pool operations with similar pool arrangements established by the Canadian Government and pursuant to the provisions of the United States–Canada Memorandum of Arrangements, Great Lakes Pilotage, or any other arrangements established by the United States and Canadian Governments."  46 C.F.R. § 401.320(d)(6); *see also* § 401.710(b).

7

set forth in more detail below, the Coast Guard contends that LPA improperly passed along "transportation" charges -- hiring a driver to take a pilot from their home base to a change point instead of driving themselves -- to vessels because such charges were not permitted under § 401.420, nor authorized by the Director pursuant to § 401.430.

Under LPA's Working Rules, a pilot transferring from one station to another "shall have the option of taking six (6) hours rest." (A.R. 002835-36). If this is not possible, a pilot is "provided with a driver for transfer." (*Id.* at 002836). LPA claims that due to an increase in shipping traffic[4] and a reduction of the number of pilots, pilots regularly hired drivers in 2006 and 2007 to take them to vessels. (*Id.* at 000085). In so doing, pilots rested en route in lieu of resting upon arrival. (*Id.*). Each such "transportation" charge ranged from $40 to $150. (*Id.* at 000003a).

LPA argues this practice facilitated the flow of safe commerce, which was a "'win-win' situation for Great Lakes pilotage" because "[f]or the relatively small cost of the driver . . . a ship avoids a six-hour delay and the pilot obtains his rest during the drive. Because ship delays cost a ship owner thousands if not tens of thousands of dollars, [hiring a driver] is a sensible, common-sense way to address

---

[4] The Coast Guard asserts that the administrative record does not reflect this "surge" in vessel traffic. (Def's Mtn., Dkt. # 24, at 27). There is, however, indication to the contrary. (*See* A.R. 000087). LPA's reasoning for adding the transportation charge, however, is not material to whether it was entitled to charge it.

the inevitable ebbs and flows of pilotage scheduling." (*Id.* at 000086). LPA's president, Captain Dan Gallagher, "directly raised the LPA's need to use a driver and bill shipping companies for the transportation costs in order to reduce the number of delays" with the Director. (*Id.* at 000033). The Director orally approved of this request, "stat[ing] that he did not object to the billing of the transportation costs as long as the shipping industry did not object." (*Id.*). The shipping industry never objected to this fee. (*Id.*).

## B.    The Dispute Between the Parties

On July 20, 2006, the Coast Guard notified the LPA that a vessel had disputed three overcarriage charges relating to pilots who boarded within the Canal at Port Colborne and not at the arc. (*Id.* at 000982). As set forth in this notification, the Coast Guard treated this dispute as a request for the Director to issue an advisory opinion on the propriety of the charges. (*Id.*; *see* 46 C.F.R. § 401.431(a)). This set off a chain of events that is now approaching its seventh year, including an expansive investigation by the Director into the overcarriage issue, the transportation charge issue, and four other alleged practices of overbilling,[5] a referral to the Coast Guard Investigative Service, a referral to the Office of the U.S. Attorney for the Eastern District of Michigan (which declined to

---

[5] These other four issues -- overcharges for pilotage services for the "Southeast Shoal" area; misapplication of surcharges; overcharges for double pilots for Port Lorain; and improper charging of dispatch fees for District Three pilots -- are not at issue in this suit.

prosecute), and a multitude of administrative reviews ultimately culminating with this lawsuit.[6]

The Coast Guard issued three determinations -- set forth below in more detail for each particular issue -- concerning LPA's billing practices. On February 3, 2009, Rajiv Khandpur (Khandpur), issued the Coast Guard's initial agency determination. (A.R. 000090-108; 000134-49). Khandpur revisited this decision on May 24, 2011, making no material change to the two issues presently before this Court. (*Id.* at 000109-11). On June 22, 2011, LPA timely appealed Khandpur's decision to Khandpur's supervisor, D.A. Goward (Goward). (*Id.* at 00061-89). Goward issued the Coast Guard's Final Decision on October 21, 2011, denying the LPA's appeal with respect to the overcarriage and transportation charge issues. (*Id.* at 000001-5). Accordingly, Goward found that the LPA must "repay industry the $192,882.50 that was inappropriately charged during the 2006

---

[6] LPA suggests the complaining vessel had ulterior motives when making its complaint, noting that its agent emailed the Pilotage Office stating that the LPA "SEEMS TO LIKE PAYING LAWYERS MAY BE WE SHOULD ENCOURAGE THEM TO SPEND MORE AT LEAST THEY WILL HAVE LESS TAKE HOME PAY (sic)." (A.R. 000961). LPA also takes issue with the characterization that it threatened work stoppages and hints at the Coast Guard threatening it with decertification in an attempt to resolve this matter. These are collateral issues that do not relate to the merits of this case. *See, e.g, Allegheny Defense Project, Inc. v. U.S. Forest Serv.*, 423 F.3d 215, 231 (3d Cir. 2005) ("When a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its stated reasons. Moreover, we can assess the facts and evidence of record; we cannot speculate about the agency's ulterior motives to an extent not supported by the record.") (citations omitted).

and 2007 shipping seasons." (*Id.* at 000005).  The LPA timely appealed to this Court.

### 1.    Overcarriage Issue

#### a.    Initial Decisions

The Coast Guard's February 3, 2009 initial agency decision responded directly to submissions by the LPA contending that the overcarriage charges were proper.  (*See id.* at 000171-190).  Khandpur first admitted that "the regulation then in effect incorrectly listed the 'pilot change point' as a lock on the Welland Canal." (*Id.* at 000092).  He also noted that "[w]ith the latest change to the applicable regulations and the Pilotage Office's clarification to the LPA that billing for overcarriage in Port Colborne is impermissible, any *confusion* has now been resolved." (*Id.* at 000093) (emphasis added).

Next, Khandpur found that "pilots have always actually exchanged their responsibilities for vessels coming from and going to the Welland Canal within Port Colborne or in the Port Colborne anchorage.  The most common point at which pilots wait to take charge of approaching vessels is at the 'park bench' near the southern end of the Welland Canal.  The pilot boat picks up the oncoming pilot near that bench, and then transports the pilot to the vessel while still underway.  Once the pilots have completed their turnover procedures, the pilot boat transports the disembarking pilot to an appropriate point ashore, usually near that same park

bench." (*Id.* at 000092)  Such a transfer, according to Khandpur "is convenient to all concerned and relativity well protected from the elements."  (*Id.*).  Khandpur also found that this transfer system is within "the scheme envisioned for change points in the Code of Federal Regulations and the 'Working Rules, Dispatching Procedures, and General Rules of Lake Pilots Association' (November 9, 1994)" -- "change points are geographic areas in which a pilot's assignment begins or ends, not specific points in the water.  Indeed, because the vessels are underway (or anchored) and the turnover process usually takes several minutes, there is no discrete 'change point,' but rather a general geographic area (Port Colborne) in which the pilots understand they will assume or relinquish their pilotage responsibilities." (*Id.*).

In rejecting the LPA's contention that its overcarriage fees were proper, Khandpur noted that "[t]he purpose of the regulatory provisions concerning additional charges for overcarriage is to cover cases when a pilot must be carried beyond the normal change point to another enumerated change point because making a change at the regular point would be dangerous or impractical." (*Id.* at 000093).  This would include, according to Khandpur, "weather or other conditions," but "[t]his rationale for charging an additional fee for overcarriage simply does not apply within the Port Colborne area."  (*Id.*).  "Moreover," continued Khandpur, "46 C.F.R. § 401.428 states that any additional charges 'are

not applicable if the ship utilizes the services of the pilot beyond the normal change point and the ship is charged for these services.'" (*Id.*).  Because "normal" connotes "typical, usual, and regular," "so long as it was an agreed place where the change of pilots actually took place, any point in the Port Colborne enviorns would qualify as the 'normal change point' for that area." (*Id.*).

Finally, Khandpur acknowledged the LPA's contention that it believed the Pilotage Office had tacitly approved the practice because it had not "clarified the appropriate change point in the Spring of 2006, when the pilots first began to submit source forces indicating that they were billing industry for this overcarriage fee." (*Id.*)  Had it done so, LPA "would have immediately terminated this practice." (*Id.*).  Khandpur also noted the LPA's position that "industry, which was paying the bills presented to it without protest, apparently did not find the practice improper or excessive." (*Id.*)  Instead of addressing these points, however, Khandpur found that "the Coast Guard had valid reasons . . . for not clarifying its position as soon as the Pilotage Office became aware of the practice, the practical effect of this over billing was to disadvantage industry. . . . In my decision, I will attempt to balance the equities and interests of all concerned." (*Id.*).  Accordingly, Khandpur found that the LPA had no legal basis for charging these fees, but "[i]n the interests of resolving this entire matter," ordered that the LPA only repay fifty-

percent of its total amount of overcarriage billings for 2006 and 2007 --
$114,776.50.  (*Id.* at 000094).

On May 24, 2011, Khandpur issued what he termed his "final
determination," reducing the total amount of repayment -- but not with respect to
the overcarriage issue.  (*Id.* at 000109-111).  Khandpur again emphasized that "in
reaching [his] decision in the matter, [he] ha[d] taken into account the possible
*confusion* that may have existed regarding the applicable pilot change point during
the 2006 and 2007 seasons, as well as LPA's representation that they will no
longer charge for over-carriage in such circumstances."  (*Id.* at 000110) (emphasis
added).

### b.    Final Decision

Upholding Khandpur's initial determination, Goward stated that "because
the applicable regulation (46 C.F.R. § 401.450) lists the location of the pilot
change points and because these change points are all expressed as general
geographic locations and not specific geographic points, I find that the charges for
over-carriage were unauthorized."  (*Id.* at 000005).  He also found that if the LPA
thought there was an issue with the "Lock No. 7 Welland Canal" reference in the
regulation, it "should have submitted a request for rulemaking to the Director,
Great Lakes Pilotage to amend the regulation."  (*Id.* at 000002a).

Accordingly, Goward rejected the LPA's argument that the MOA, Canadian pilotage regulations, nautical charts, and the *United States Coast Pilot* establish that the Change Point is one-mile south of Port Colborne on the arc. To the MOA, Goward noted that the MOA just "defines Welland Canal. It has nothing to do with establishing the pilot change point." (*Id.*). To the other pilotage source documents, Goward emphasized that LPA pilots must follow Coast Guard regulations, even if contrary to applicable Canadian regulations or nautical charts. (*Id.* at 000001a). Goward continued: "If the Coast Guard were to adopt LPA's position that the pilot change point was a specific location, this would permit LPA to charge over-carriage in every instance where a pilot relinquished his/her responsibilities at a point beyond the exact coordinates of the 'one mile arc.' However, the fact is that the regulations governing Great Lakes Pilotage have never allowed for such a rigid and impractical pilot change-out process." (*Id.* at 000002a).

Finally, Goward found "it regrettable" that Khandpur only authorized a fifty-percent reimbursement, stating that LPA should "consider[] itself quite fortunate to have been able to retain half of these unauthorized charges." (*Id.*). Goward therefore affirmed Khandpur's finding, but corrected an error in tabulating the total amount of overcarriage charges to $114,022.50. (*Id.* at 000003).

2.     **Transportation Issue**

a.     **Initial Decision**

In finding that LPA improperly billed $78,585 for the 2006 and 2007 shipping seasons in "transportation" charges, Khandpur found that Coast Guard regulations only authorize such "travel expenses" in two specific circumstances. (*Id.* at 000095). First, the regulations permit travel expenses "where the pilot has commenced traveling to undertake an assignment and the assignment is subsequently canceled." (*Id.*) (citing 46 C.F.R. § 401.420(c)(2)). Second, the regulations allow these expenses "in connection with a legitimate overcarriage beyond the normal change point." (*Id.*) (citing 46 C.F.R. § 401.428). Khandpur took note of LPA's arguments: (1) that without a driver, "its pilots would not be able to get the rest they need between assignments, and that this would likely cause a delay to the detriment of efficient shipping on the Great Lakes;" (2) that "the Coast Guard was well aware of this practice and did not object to it until recently;" and (3) that "industry considered this billing practice to be reasonable and necessary." (*Id.*). Without discussing these arguments, however, Khandpur just noted that "except for the two specific [circumstances discussed above], routine travel expenses have been and will continue to be incorporated into the rate structure." (*Id.*). In short, found Khandpur, "[t]hey are simply part of the cost to the LPA and its pilots of doing business." (*Id.*).

Khandpur's position on these transportation charges "remain[ed] unchanged" when he revisited his initial February 3, 2009 determination on May 24, 2011.  (*Id.* at 000111).   After Khandpur's initial determination, the LPA asserted that "other pilot associations . . . were charging similar transportation costs as the LPA . . . and that it would be unfair to penalize only one association."  (*Id.*).   In response, Khandpur first "note[d] that LPA is not being 'penalized' by having to refund money that it was never entitled to in the first place."  (*Id.*).   Second, Khandpur mentioned that his staff would "conduct a separate inquiry into the allegation that [other associations] ha[ve] also charged for transportation fees and, if substantiated, [he would] require reimbursement to industry for any inappropriate charges in this matter."  (*Id.*).   Finally, Khandpur reasoned that the transportation charges were "inappropriate because the Coast Guard already considers such transportation expenses and factors them into the rate structure." (*Id.*).

### b.   Final Decision

As with the overcarriage issue, Goward upheld Khandpur's determination concerning the transportation charges.  (*Id.* at 000003a-4a).   First, Goward found that "LPA fails to acknowledge in its appeal . . . that routine transportation costs are already factored into the rate the LPA charges industry for pilotage services." (*Id.* at 000003a) (emphasis omitted).   He did not, however, provide any

information concerning how this was the case. Second, Goward distinguished prior communications -- discussed in more detail below -- from the Director that LPA asserted showed that the Director authorized similar transportation charges. (*Id.* at 00003a-4). Third, Goward discounted a declaration from LPA's president attesting that the Director "stated that he did not object to the billing of the transportation costs as long as the shipping industry did not object." (*See id.* at 000033). In finding this declaration "unpersuasive," Goward reiterated that "routine transportation charges were already built into LPA's rate during the 2006 and 2007 shipping seasons." (*Id.* at 000004a). "It is therefore," according to Goward, "highly unlikely that the Director would authorize a separate charge to cover LPA's already accounted-for transportation expenses. Absent something in writing from the Director to the LPA authorizing what would amount to double-billing for transportation fees, [Goward was] unconvinced that such an authorization was actually granted." (*Id.*). Accordingly, Goward affirmed Khandpur's finding regarding the transportation charges, but ordered that the LPA repay industry $78,860.00 to correct for an error discovered in tabulating these charges. (*Id.*).

## III. DISCUSSION

**A.    Summary Judgment Standard**

This case is governed by the standards for judicial review of final agency action as prescribed under the APA, 5 U.S.C. § 701 *et seq.*  Under the APA, a court must uphold an agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *see, e.g., Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013).  Alternatively, an agency action may be set aside if it lies outside the agency's "statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or where its findings are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(E).

"An agency's decision is arbitrary and capricious when the agency has: relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)). Agency action is "not in accordance with the law" when it is in conflict with the language of the statute relied upon by the agency.  *City of Cleveland v. Ohio*, 508

F.3d 827, 838 (6th Cir. 2007). Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency even if the court might otherwise disagree with the agency's decision. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376 (1989). And, while "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations," *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (citation omitted), a court "must defer to the agency's interpretation of its own regulations unless the text is unambiguous or the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Intermodel Tech., Inc. v. Peters*, 549 F.3d 1029, 1031 (6th Cir. 2008) (citation omitted).

"The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.,* 286 F.3d 382, 387 (6th Cir. 2002) (internal quotation marks and citation omitted). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44 (1985).

In this case, then, the proper disposition of the parties' cross-motions turns upon whether, in light of the existing administrative record, the Coast Guard's Final Decision passes muster under the applicable APA standards. Given the administrative record's deficiencies, however, this Court cannot make this determination and remands this matter to the Coast Guard for further proceedings consistent with this Opinion and Order.

**B.      Violation of the Administrative Procedure Act (Count I)**

LPA asserts that the Coast Guard's Final Decision violates the APA with respect to both its overcarriage and transportation charges. To the overcarriage issue, LPA argues that it is arbitrary and capricious, and is not in accordance with the law. As to the transportation charges, LPA claims that it is arbitrary and capricious. Each are addressed in turn.

**1.      Overcarriage Issue**

**a.      Was the Coast Guard's Final Decision arbitrary and capricious?**

While this Court does not take deference to the Coast Guard's interpretation of its own regulations lightly, remand is appropriate to evaluate this interpretation in light of facts not in the administrative record. In its Final Decision, the Coast Guard advances seemingly contradictory reasons for justifying its overcarriage decision. First, the Final Decision rejects the LPA's argument that the MOA moved the Change Point to the arc. The Coast Guard argues, consistent with the

Final Decision, that the MOA just set the Canal's boundaries.  This Court must defer to this interpretation if it is reasonable.  *See, e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Fund for Animals v. Kempthore*, 538 F.3d 124, 134-35 (2d Cir. 2008) (deferring to agency's interpretation of convention between the United States and Mexico regarding hunting of certain migratory birds); *cf Caterpillar Tractor Co. v. Comm'r of Patents & Trademarks*, 650 F. Supp. 218, 220 (E.D. Va. 1986) ("Nor is the court inclined to accord substantial deference to an agency's interpretation that its own regulation is not in conflict with a treaty provision.").

The factual record regarding whether the MOA effectuated an alteration in the Change Point, however, is not sufficiently before this Court.  Surprisingly, there is nothing in the administrative record discussing how the Coast Guard interpreted the application of the MOA prior to the administrative review in this matter.  LPA proffered some evidence that *other* entities claim the Change Point is located along the arc, such as nautical charts and other pilotage documents.  (*See* A.R. 000002, 000029).  And there is no doubt that the LPA's Canadian counterpart considers the Change Point to be "along the 1 mile radius line from the Port Colborne piers . . . [because the MOA] stipulates that the Welland canal is solely a Canadian Region and therefore only (sic) Canadian pilot could have the conduct of

vessel subject to compulsory pilotage in [the Canal.]"   (*Id.* at 000039, 000041).

The Final Decision refused to find such evidence persuasive, noting that Canadian

pilots are governed by Canadian regulations and that the LPA's proffered source

documents conflicted with the Coast Guard's regulations.

    This is the extent to which the administrative record discusses this issue.[7]   In

Reply, LPA proffered such evidence for the first time.  Attaching an affidavit from

the Pilotage Office's Director at the time the MOA was agreed upon, the LPA

asserts that: (1) it was "fully understood that the arc -- which was the line of

demarcation between the Welland Canal and Lake Erie -- was the new change

point," (2) the "regulation was no longer operative because Lock 7 was located in

the Welland Canal;" and (3) the change "was made with the knowledge and

agreement of all parties, including the American and Canadian regulators, the

pilots from both countries, and the shipping industry, . . . under the explicit

direction of the MOA."  (Ex. 1 to Plf's Reply, Dkt. # 25, at 18-19).

    The Coast Guard objects to this affidavit, noting that it was not presented

below and that it was obtained without compliance with regulations governing

---

[7] Indeed, even Khandpur's initial determinations note "confusion" regarding the
location of the Change Point after the MOA.  (A.R. 000093, 000110).  The
Administrative Record also reflects that as late as June 12, 2006, the Pilotage
Office Director did not know the location of the "normal boarding point."  (*Id.* at
000958) (inquiring as to whether the "normal boarding point" was at Lock 8 inside
the Canal or by the "pilot boat at Port Colborne.").  A few months later, the
Director then characterized the Canal as "not . . . the regular change point.")  (*Id.* at
001003).

testimony of former Department of Homeland Security employees.  (*See* Def's Reply, Dkt. # 26, at 8) (citing 6 C.F.R. § 5.44).  This Court agrees and declines to consider the facts set forth in this affidavit for those reasons.  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

Given the dearth of evidence concerning how the MOA affected change points after 1977 (when the pilotage services in the Canal became exclusively Canadian), remand is appropriate in this circumstance.  It is not this Court's intention to "convert judicial review of agency action into a ping-pong game where remand would be an idle and useless formality."  *Rabbers v. Comm'r Social Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (citation omitted).  That said, the Court cannot determine whether the Final Decision's holding that the MOA only changed the Canal's boundary without modifying the Change Point is arbitrary and capricious without some evidence of how the parties viewed the MOA after 1977.[8] Accordingly, the "proper remedy . . . [is to] remand to the agency for additional investigation or explanation, because '[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to

---

[8] Though the Court is substantively precluded from considering the affidavit of the former Pilotage Office's Director, as set forth above, remand is appropriate for the Coast Guard to reopen and the record and consider evidence relevant to the issue of how the MOA modified the Change Point (if at all), including the affidavit.

reach its own conclusions based on such an inquiry.'" *Kroger Co.*, 286 F.3d at 387 (quoting *Florida Power*, 470 U.S. at 744) (second alteration in original) (citation omitted).

Second, the Final Decision finds that "the scheme envisioned for change points in the Code of Federal Regulations is that change points are general geographic areas in which a pilot's assignment begins or ends, not specific points in the water." (A.R. 000001). There is support for this interpretation, as all locations listed in 45 C.F.R. § 401.450 are not expressed in specific geographic points. The problem, however, is that the Final Decision then cites the regulatory scheme adopted in 1968 -- the one mandating a Change Point at Lock Number 7 within the Canal -- as the controlling authority at one point, but yet also acknowledges that "[a]t some point after the 1968 [Regulations] . . . , Canada assumed sole responsibility for piloting vessels in Welland Canal [and t]herefore, as a practical matter, pilots began changing at Port Colborne vice Lock No. 7 Welland Canal." (*Id.* at 000002a). Port Colborne is, of course, another general geographic area, but was not, at the time, part of the codified regulatory scheme. In short, the Coast Guard strictly applied a regulatory scheme -- pilots must change at general geographic points -- to an area where it admits that the regulatory scheme is "practically" defunct. This application, of course, could be explained --

2:11-cv-15462-GER-MAR   Doc # 33   Filed 09/30/13   Pg 26 of 33   Pg ID 3328

or not -- with the missing facts discussed above.[9]   Factual clarity is needed here,

which must be explored at the agency level.

### b.   Was the Coast Guard's Final Decision contrary to law?

LPA additionally argues that the Final Decision is contrary to law because

the MOA trumps the regulatory scheme.   "Once the Canadians took over all

pilotage in the Canal," argues LPA, "American pilots could no longer change at

Lock 7 and the regulation's designation of Lock 7 became simply wrong."  (Plf's

Mtn., Dkt. # 17, at 25).   In essence, Plaintiff asserts that the MOA had the effect of

shifting the Change Point from Lock 7 inside the Canal to the southern arc just

outside Port Colborne.   Therefore, according to the LPA, it was justified in

---

[9] In its papers, LPA offers several other arguments for why it believed the Final
Decision was arbitrary and capricious, each of which are not persuasive based
upon the administrative record presented here.   First, it asserts that the Final
Decision retroactively applied the new regulation defining the Change Point at Port
Colborne, yet the Final Decision clearly stated that it applied the *old* regulatory
scheme.  (*see* A.R. 000002a).  Second, LPA claims that the Final Decision did not
account for why it began switching pilots inside the Canal -- i.e., to facilitate
traffic.  The regulatory scheme does not, however, contemplate an analysis of *why*
a pilot fails to change at a particular Change Point and rather just permits
overcarriage fees "[i]f a U.S. pilot is carried beyond the normal change point or is
unable to board at the normal boarding point."  46 C.F.R. § 401.428.  Third, LPA
asserts that the Final Decision required it to demonstrate that changing at the arc
was "dangerous or impractical."  As the Coast Guard points out, the Final Decision
did not so hold.  Rather, this language is in Khandpur's initial decision.  (A.R.
000093).  Because the regulatory scheme does not, as noted above, require such a
showing and because the Final Decision does not rely upon this language, LPA's
argument fails.  Finally, and for this reason as well, LPA's claim that a prior
advisory opinion by the Director discussing overcarriage charges to "facilitate
traffic" is also inapplicable.

charging for overcarriage when pilots changed inside the arc -- i.e., inside the Canal at Port Colborne.

In rejecting this argument, the Final Decision correctly notes that "the MOA's language does not recognize a 'designated change point' on eastern Lake Erie. . . . Rather, the MOA identifies the geographic constraints of the Welland Canal in the context of defining the boundaries of District 2." (A.R. 000001a). And, as the Coast Guard points out in its papers, LPA's argument for why the MOA had the effect of modifying the Change Point is akin to having its cake and eating it too. (*See* Def's Reply, Dkt. # 26, at 1-2). On the one hand, LPA essentially argues that the regulatory scheme is defunct because American pilots cannot change inside the MOA's definition of the Canal. On the other hand, LPA charged vessels for overcarriage when it changed U.S. pilots inside the Canal.

The parties do not dispute that as an international executive agreement, the MOA carries the force of law. *See, e.g, American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003); *Owner-Operator Indep. Drivers Ass'n v. US Dep't of Transp.*, 724 F.3d 230 (D.C. Cir. 2013); *Dep't of Defense v. FLRA*, 685 F.2d 641, 648 (D.C. Cir. 1982). Instead, they dispute whether the MOA provides LPA with a private right of action to essentially enforce the MOA. In the context of interpreting treaties to provide private rights of action, the Sixth Circuit has noted that some treaties expressly provide for private rights of action and some do not.

*Renkel v. United States*, 456 F.3d 640, 643 (6th Cir. 2006).   "In fact, courts *presume* that the rights created by an international treaty belong to a state and that a private individual cannot enforce them."   *Id.* (quoting *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001)).   For a court to determine whether a private right of action exists, therefore, courts distinguish between "self-executing treaties" and "non-self-executing treaties."   The Sixth Circuit made this point clear in *Renkel*:

> "Self-executing treaties" are those treaties which do not require domestic legislation to give them the full force of law.  Such treaties can create private rights enforceable in court.  On the other hand, "non-self-executing" treaties do require domestic legislation to have the force of law.  For a non-self-executing treaty, any private claim must be based on a violation of the domestic law implementing the provisions of that treaty.  In other words, federal courts are bound to give effect to international law and to international agreements, except that a 'non-self-executing' agreement will not be given effect as law in the absence of necessary authority.

*Id.* (internal citations and quotations omitted).   Accordingly, courts must "look to the express terms of the treaty, and then to 'the treaty as a whole' to determine whether it evidences an intent to be self-executing and to create a private right of action."   *Id.*

LPA argues that its cause of action here rests not under the GLPA or the MOA, but rather under the APA.  In support, the LPA cites a variety of cases examining the "otherwise not in accordance with law" provision of 5 U.S.C. § 706(2)(A) when the statute in question did not provide a private cause of action.

*See, e.g., Andrx Pharm. v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002). The Coast Guard counters by pointing this Court towards other treaty/executive agreement cases requiring a finding of a private cause of action. *See, e.g., Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988); *De La Torre v. United States*, 2004 WL 3710194 (N.D. Cal. Apr. 14, 2004).

Neither the LPA nor the Coast Guard, however, presented cases analogous to the present situation: whether an international agreement expressly authorized by a statute -- 46 U.S.C. § 9305 -- provides the basis for a claim under the "not in accordance with the law" provision of the APA. Nor could this Court's own research locate any such authority. This Court need not, however, resolve this issue. Even assuming that the LPA may rely upon the MOA to support its contrary to law argument, the factual record regarding the interplay between the MOA and the Change Point, as set forth above, is not sufficiently before this Court.

### 2. Transportation Charges

The crux of the Final Decision's reasoning as to why LPA's transportation charges were inappropriate is that such costs are "already factored into the rate the LPA charges industry for pilotage services." (A.R. 000003a) (emphasis omitted). Such expenses, as Khandpur put it, are just part of the cost of doing business. LPA takes issue with this, asserting that it does "not demonstrate how this had been done, or how it would make sense to 'factor into the rate' costs that the pilots had

no obligation to incur and that were incurred to handle an unforeseen surge in vessel traffic."  (Plf's Mtn., Dkt. # 17, at 20).  For support, the LPA points to the regulatory history for rate setting, two prior letters from the Director concerning the billing of travel costs, and an affidavit from LPA's President attesting that the Director specifically authorized the LPA to bill these transportation charges.

Remand is appropriate on this issue as well.  Under the Coast Guard's regulations, LPA is only authorized to bill travel expenses in three circumstances: (1) if a pilot's services are canceled, delayed, or interrupted (46 C.F.R. § 401.420); (2) if there is overcarriage (46 C.F.R. § 401.428); and (3) if "approv[ed by] the Director" (46 C.F.R. § 401.430).  The last two circumstances are at issue here. First, as LPA points out, if it prevails on the overcarriage issue discussed above, it would be entitled to those "reasonable travel expenses to or from the pilot's base." 46 C.F.R. § 401.428.

Second, the LPA put forth evidence indicating that the Director had orally authorized the transportation charges.  (A.R. 000033).  The Final Decision discounted this, reasoning it was "highly unlikely that the Director would authorize a separate charge to cover LPA's already accounted-for transportation expenses. Absent something in writing from the Director to the LPA authorizing what would amount to double-billing for transportation fees, I am unconvinced that such

authorization was actually granted." (*Id.* at 000004a). The problem, however, is that this factual finding is not supported with substantial evidence.

The administrative record is silent with respect to whether *these* transportation charges were built into 2006 and 2007 rate structures. Though the Coast Guard points out that the regulatory scheme "does not provide for direct 1:1 reimbursement of transportation costs [and rather] sets basic rates that are based, in part on prior transportation costs," (Def's Mtn., Dkt. # 24, at 27) (citing 46 C.F.R. Part 404), it fails to acknowledge that these transportation costs were incurred exclusively for the benefit of vessels -- for their convenience of not having to wait for pilots to rest after traveling to a change point.

In 2003, the Director authorized the LPA to add surcharges for "transportation, hotels and subsistence when a pilot is retained for the convenience of a vessel." (A.R. 000049). Here, LPA added charges not at the end of a pilot's service, but at the beginning. Both this charge, and the charge at issue in 2003, were designed around convenience. There is nothing in the administrative record indicating that such charges in 2003 were not part of the regular rate, but that they somehow were in 2006.[10] Indeed, a review of the regulatory scheme indicates that

---

[10] The Final Decision finds that this "letter erroneously concludes that in such situations charging for transportation, hotels, and subsistence is permissible" and is covered by 46 C.F.R. § 401.420. (A.R. 000004). This may be the case, but it significantly undercuts the Coast Guard's argument that transportation costs were baked into the regular rate.

similar transportation costs were added into the regular rate of *another pilots association* for another district effective April 3, 2006. (*Id.* at 000004-4a, 000033, 000051-57).[11] Upon review of the rate history and administrative record, this Court cannot find substantial evidence to support the Coast Guard's determination that this transportation charge was wrapped into the regular rate.

Without these facts, the Final Decision's reasoning for dismissing Gallagher's affidavit crumbles. The Coast Guard argues that the Director implicitly contradicts this affidavit, noting that it was the Director who initially raised the issue of the impropriety of the transportation charges in the first place. (*See* A.R. 000371) (Director's declaration in April 2007 to the Coast Guard Investigative Service concluding that the "practice of billing transportation on nearly every invoice was not accidental, but likely an intentional act in violation of the provisions of 46 C.F.R. § 401.430"). Given the discussion above regarding whether the regular rate covered the transportation charges, however, this Court declines to find an implicit denial of Gallagher's affidavit. Remand is therefore appropriate to reopen the factual record as to the rate structure in place in 2006 and 2007 and whether the Director expressly authorized these transportation charges.

---

[11] It is also worth noting that in regards to this other pilots association, the Director even authorized transportation charges until the rate adjusted in 2006. (A.R. 000004a).

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the parties' respective cross-motions for summary judgment [Dkt. ## 17 and 24] are DENIED.

IT IS FURTHER ORDERED that this matter is REMANDED to Defendant for further consideration consistent with this Opinion.

**IT IS SO ORDERED.**

Dated:  September 30, 2013          s/Gerald E. Rosen
                                 GERALD E. ROSEN
                                 CHIEF, U.S. DISTRICT COURT

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, September 30, 2013, by electronic and/or ordinary mail.

                                 s/Julie Owens
                                 Case Manager, 313-234-5135